UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SINCLAIR & WILDE, LTD.,<br><br>      Plaintiff,<br><br>  -against-<br><br>BARER HOLDING CO. ET AL.,<br><br>     Defendants. | 24-cv-8488 (JSR)<br><br>OPINION |

JED S. RAKOFF, U.S.D.J.:

This case concerns a dispute between two companies, plaintiff Sinclair & Wilde, Ltd. ("Sinclair") and defendant Barer Holding Company ("Barer"), that contracted to manufacture and distribute military uniforms and textiles for the Ministry of Defense of Ukraine (the "Ministry"). This Court previously issued an Order granting in part and denying in part Barer's motion to dismiss. See ECF No. 23. This Opinion states the reasons for that Order.

I.   Background

The following allegations are drawn from the complaint. In February 2022, Russia invaded Ukraine. Sinclair, a Delaware corporation with its headquarters and principal place of business in New York, sought to contract with the Ministry to manufacture and distribute uniforms and textiles for Ukrainian soldiers. To that end, Sinclair entered into a power of attorney with Erik Henin, a French citizen, who was authorized to sign and execute an agreement with the Ministry on Sinclair's behalf.

1

With Henin's help, Sinclair secured five manufacturing agreements with the Ministry in October 2022. Each of those agreements lists Sinclair's New York address. Pursuant to those agreements, the Ministry was responsible for paying Sinclair approximately $35 million in exchange for the uniforms and textiles. After the agreements were finalized, Sinclair paid Henin for his services through its Bank of America account located in New York City.

Sinclair then engaged defendant Barer, a Turkish company with its headquarters and principal place of business in Turkey, to supply the uniforms and textiles to the Ministry on its behalf under a separate agreement. Defendant Oktay Ercan, a Turkish citizen, is Barer's president and majority owner. Sinclair similarly paid Barer for its services through its Bank of America account.

By June 2023, the Ministry had paid Sinclair $20 million and had a remaining balance of approximately $14.5 million. Sinclair alleges that the defendants (collectively Barer, Ercan, and Henin) then conspired to convince the Ministry to breach its contract with Sinclair by paying Barer, rather than Sinclair, the remaining balance. To that end, Henin assigned Sinclair's right to receive the outstanding funds to Barer in a forged assignment agreement without Sinclair's authorization. Although the Ministry's legal department concluded that the assignment agreement was, in fact,

forged, the Ministry nevertheless chose to rely on it, refused to pay Sinclair the remaining balance, and terminated its business relationship with Sinclair.

Sinclair further alleges that the defendants then proceeded to engage in a campaign to defame Sinclair and further harm its business. For his part, Henin made various false statements to Bank of America, which later closed Sinclair's New York account. Meanwhile, Ercan had Barer's counsel send an email to Goldman Sachs in New York accusing Sinclair of engaging in fraudulent and otherwise illegal transactions and misappropriating government funds. According to Sinclair, Barer and Ercan sent the email to influence a special agent in the United States Department of Defense who was then investigating the assignment agreement. Together, Barer and Ercan also told Turkish authorities that Sinclair had failed to pay Barer for its services, leading to the arrest of Sinclair's CEO, Phillip Solomon, in Turkey. Solomon was eventually released after his arrest, but was instructed by Turkish law enforcement that he could not leave Turkey for thirty-seven days. Solomon's arrest and delay in Turkey allegedly cost Sinclair over $100 million in lost profits.

In April 2024, Sinclair filed suit against the defendants in New York Supreme Court, raising five claims. First, Sinclair alleged that the defendants had tortiously interfered with its supply agreements ("Count 1"). Second, Sinclair alleged that the

defendants had tortiously interfered with its current and prospective business relationships with the Ministry and Bank of America ("Count 2"). Third, Sinclair alleged that the defendants committed fraud ("Count 3"). Fourth, Sinclair alleged that Barer and Ercan falsely imprisoned and engaged in malicious prosecution against Solomon ("Count 4"). Finally, Sinclair alleged that the defendants committed libel and defamation by falsely accusing Sinclair of engaging in various criminal activities ("Count 5").

The defendants removed to this Court on the basis of diversity, after which Sinclair filed an amended complaint, which raised the same five claims. Defendants have now moved to dismiss the amended complaint.

II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[1] Walker v. Senecal, 130 F.4th 291, 297 (2d Cir. 2025) (per curiam). In evaluating a complaint, a court must "construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff's favor." Singh v. Deloitte LLP, 123 F.4th 88, 93 (2d Cir. 2024). "However, threadbare recitals of the

---

[1] Unless otherwise indicated, all case quotations omit internal alterations, brackets, citations, ellipses, emphasis, quotations, and quotation marks.

elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

III. Discussion

Defendants argue that the Court should dismiss the complaint for three reasons. First, they argue that the Court lacks personal jurisdiction. Second, they argue that dismissal is required on forum non conveniens grounds. And third, they argue that that Sinclair has failed to adequately allege any of its claims. Sinclair has consented to the dismissal of Count 3, see Answering Brief at 17, so the Court need only consider those arguments as they apply to Counts 1, 2, 4, and 5.[2] For the reasons stated below, the Court grants Barer's motion with respect to Count 4 and 5, but denies it with respect to Counts 1 and 2.

A. Personal Jurisdiction

In order for a federal court to exercise personal jurisdiction over a defendant, three requirements must be satisfied. First, the defendant must have been properly served. See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59 (2d Cir. 2012). Second, the Court must have a statutory basis for jurisdiction. See id. at 59-60. And third, the court's exercise of personal jurisdiction must comport with constitutional principles of due

---

[2] Sinclair has also agreed to dismiss the malicious prosecution aspect of Count 4, leaving just the false imprisonment aspect of that claim. See Answering Brief at 25.

process. See id. at 60. Here, the defendants do not dispute that they were properly served, so the Court's jurisdictional analysis centers on the second and third requirements.

As for the second requirement, New York's long-arm statute provides a statutory basis for jurisdiction for a non-domiciliary defendant who either: (1) "transacts any business within the state or contracts anywhere to supply goods or services in the state;" (2) "commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act;" (3) "commits a tortious act without the state, causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act," so long as he either "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state" or "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from the interstate or international commerce;" or (4) "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. § 302(a).

The third requirement concerning constitutional principles of due process has two parts, both of which have several sub-parts. See Peterson v. Bank of Markazi, 121 F.4th 983, 1005 (2d Cir. 2024). First, a court must determine whether a defendant has sufficient "minimum contacts" with the state. See Metro Life Ins.

Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996). In determining whether a defendant has sufficient minimum contacts, courts consider whether she purposely availed herself of the forum and whether the claims against her arise from her conduct in the forum. See Chew v. Dietrich, 143 F.3d 24, 27-29 (2d Cir. 1998). Second, a court must determine whether the exercise of personal jurisdiction would be reasonable under the specific circumstances of the case. In assessing reasonableness, a court must consider five additional factors: (1) "the burden that the exercise of jurisdiction will impose on [the defendant]," (2) "the interests of the forum state in adjudicating the case," (3) "the plaintiff's interest in obtaining convenient and effective relief," (4) "the interstate judicial system's interest in obtaining the most efficient resolution of the controversy," and (5) "the shared interests of the states in advancing substantive policies." Gucci Am., Inc. v. Weixing Li, 135 F. Supp. 3d 87, 99 (S.D.N.Y. 2015). If a defendant has minimum contacts with the state and exercising personal jurisdiction over her would be reasonable under the circumstances, then a court may conclude that its exercise of personal jurisdiction would comport with constitutional principles of due process.

    In light of these requirements, the Court concludes that it may exercise personal jurisdiction over all three defendants with respect to Counts 1 and 2, but that it lacks a statutory basis to

exercise personal jurisdiction over any of the defendants with respect to Counts 4 and 5.

        i.   Tortious Interference Claims (Counts 1 and 2)

As outlined above, New York's long-arm statute sets forth four alternative bases for the exercise of personal jurisdiction. Sinclair argues that two of those four bases are applicable with respect to Counts 1 and 2 because the defendants transacted business in New York (so that section 302(a)(1) is satisfied) and caused reasonably foreseeable harm in New York (so that section 302(a)(3) is satisfied). The Court agrees with Sinclair as to both bases for jurisdiction.

Under section 302(a)(1), which provides a statutory basis for personal jurisdiction over defendants who transact business in New York,[3] "the jurisdictional inquiry is twofold: under the first prong the defendant must have conducted sufficient activities to have transacted business within the state, and under the second prong, the claims must arise from the transactions." Am. Girl, LLC. v. Zembrka, 118 F.4th 271, 276-77 (2d Cir. 2024). "[P]roof of one transaction in New York is sufficient to invoke jurisdiction under 302(a)(1), even though the defendant never entered New York,

---

[3] Both sides agree that the defendants do not "supply goods or services" in New York, so the Court focuses its analysis on whether they "transact[] any business" there. N.Y. C.P.L.R. § 302(a); see Oral Argument Transcript at 10:8-11.

so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1109 (2d Cir. 1997) (quoting Kreuter v. McFadden Oil Corp., 71 N.Y. 2d 460, 467 (N.Y. 1988)).

Sinclair has adequately alleged that the defendants transacted business in New York and that its tortious interference claims arise from those transactions. The complaint specifies that the defendants contracted with Sinclair, a company with its headquarters and principal place of business in New York. The defendants received payments from Sinclair's Bank of America account in New York and their alleged interference with both Sinclair's supply agreements (all of which listed Sinclair's New York address) and Sinclair's business relationship with the Ministry allegedly resulted in the Ministry failing to make over 14.5 million dollars' worth of payments to that same account. Indeed, all of the relevant payments in this case were allegedly made either to or from Sinclair's New York bank account. Cf. Roe v. Arnold, 502 F. Supp. 2d 346, 350-51 (E.D.N.Y. 2007) (determining that section 302(a)(1) applied where all of the relevant payments that the defendant received "originated from" New York). Because "proof of one transaction in New York is sufficient to invoke jurisdiction" under section 302(a)(1), PDK Labs, 103 F.3d at 1109, Sinclair has adequately alleged that the defendants transacted

business there. Moreover, the complaint alleges that the defendants conspired to direct the Ministry's funds away from Sinclair's New York bank account to the defendants, so that Sinclair's tortious interference claims arise from the defendants' transactions in New York.

The defendants insist that they do not transact business in New York because they were retained to fulfill Sinclair's supply agreements in Ukraine and operated in Turkey and because the payments to and from Sinclair's New York bank account cannot serve as a basis for exercising personal jurisdiction under section 302(a)(1). In holding that section 301(a)(1) provides a statutory basis for jurisdiction in this case, the Court does not mean to suggest that the existence or involvement of a New York bank account is always sufficient to confer jurisdiction under section 301(a)(1). To the contrary, the Court recognizes that, in determining whether a section 301(a)(1) applies in a particular case, a court must engage in a case-specific analysis and consider "the totality" of a particular defendant's activities within New York. Best Van Lines v. Walker, 490 F.3d 239, 246 (2d Cir. 2007). Here, the complaint alleges that Sinclair and the Ministry were engaged in business transactions in New York, that Henin facilitated those transactions, and that Barer (Ercan's company) served as a subcontractor to Sinclair in fulfilling its obligations to the Ministry. Under these particular circumstances, where the

10

complaint indicates that the defendants knowingly facilitated, participated in, profited from, and interfered with business transactions in New York, the Court concludes that the defendants transacted business in New York.[4]

However, even if this Court lacks a statutory basis for exercising personal jurisdiction over the defendants under section 302(a)(1), this Court would still have jurisdiction under section 302(a)(3). As a reminder, New York's long-arm statute provides for personal jurisdiction where a defendant "commits a tortious act without the state, causing injury to person or property within the state," so long as he "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from the interstate or international commerce." N.Y. C.P.L.R. § 302(a)(3). With respect to Counts 1 and 2, the complaint alleges that the defendants engaged in several tortious acts both outside and inside of New York, including conspiring to create and creating the fraudulent assignment agreement and making false statements to officials at Bank of America in New York.[5] It further alleges that

---

[4] Indeed, at oral argument, counsel for the defendants appeared to concede that such an arrangement, where a third-party is a "classic middleman or intermediary of some sort," "could be considered a form of doing business in New York." Oral Argument Transcript 20:21-21:1-3, 17-19.

[5] Section 302(a)(3) excludes defamation claims. However, Count 2 raises a claim for tortious interference with current and prospective business relationships, not defamation. Although some of the allegations underlying that claim involve defamatory and

11

those actions injured Sinclair in New York by stopping the Ministry from making over 14.5 million dollars' worth of payments to Sinclair's New York bank account and by causing Bank of America to close that account. As discussed in greater detail below, Sinclair also alleges that the defendants were aware of both Sinclair's supply agreements with the Ministry and Sinclair's Bank of America account. Accordingly, the defendants would or should have expected that their actions would have consequences in New York. Finally, as discussed above, the defendants received substantial sums for their involvement in the international business transactions between Sinclair and the Ministry. This Court may therefore exercise personal jurisdiction over the defendants pursuant to section 302(a)(3).

Having determined that it has two alternative and independent statutory bases for exercising personal jurisdiction over the defendants with respect to Counts 1 and 2, the Court proceeds to consider whether exercising personal jurisdiction would comport with due process. To repeat, that analysis has two parts, minimum contacts and reasonableness. See Peterson, 121 F.4th at 1005. Both parts are satisfied here. As discussed above, the defendants availed themselves of New York through their involvement in the

_____

libelous statements, the plain text of section 302(a)(3) excludes only defamation claims, not other types of claims involving such allegations.

business transactions between Sinclair and the Ministry, and Sinclair's tortious interference claims arise out of that conduct. The Court therefore concludes that they have sufficient minimum contacts for due process purposes. See Chew, 143 F.3d at 27-29 (2d Cir. 1998).

The defendants do not contest that the reasonableness factors weigh in favor of finding that exercising jurisdiction comports with due process. However, weighing those factors in the first instance, the Court further concludes that exercising jurisdiction over the defendants would be reasonable under the unique circumstances of this case. As discussed in greater detail below, proceeding in this Court will not place a substantial burden on the defendants. Moreover, New York has a strong interest in adjudicating the rights of a company that has its headquarters and principal place of business in New York and which allegedly suffered an injury there. Finally, the interests of the international judicial system in "efficiency" are served by proceeding expeditiously in this Court. Gucci Am., Inc., 135 F. Supp. at 99.

For the foregoing reasons, the Court concludes that it may exercise personal jurisdiction over the defendants as to Counts 1 and 2.

ii.  False Imprisonment (Count 4)

New York's long-arm statute is sufficient to confer personal jurisdiction with respect to Counts 1 and 2, but it is not sufficient to confer jurisdiction with respect to Count 4. Sinclair alleges that the defendants falsely imprisoned Solomon in Turkey. Even assuming that those allegations concern conduct committed by the defendants, rather than Turkish government, they do not involve any transactions in New York. Nor do they involve any tortious acts that were committed in New York or that caused injury in New York. And Sinclair does not allege that the defendants own any property in New York. Accordingly, the Court must dismiss Count 4 for lack of personal jurisdiction.

iii. Libel and Defamation (Count 5)

Finally, New York's long-arm statute does not provide a statutory basis for exercising personal jurisdiction with respect to Count 5. Sinclair does not allege that the libel and defamation arose from any transactions in New York. Section 302(a)(3) specifically excludes causes of action for "defamation of character," which includes causes of action for both libel and defamation. See Best Van Lines, Inc., 490 F.3d at 245 n.7 (explaining that, for purposes of section 302(a), "defamation" includes the torts of libel and slander). And, as stated above, the Sinclair does not allege that the defendants own any property

in New York. Accordingly, this Court must also dismiss Count 5 for lack of personal jurisdiction.

B. Forum Non Conveniens

The defendants also urge the Court to dismiss the amended complaint on forum non conveniens grounds because, in their view, Turkey is the appropriate forum. This Court follows the three-step forum non conveniens analysis set forth in the Second Circuit's unanimous en banc decision in Iragorri v. United Technologies Corp., 274 F.3d 65 (2d Cir. 2001). The three steps are "(1) determine the degree of deference properly accorded the plaintiff's choice of forum; (2) consider whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute; and (3) balance the private and public interests implicated in the choice of forum." Aenergy, S.A. v. Rep. of Angola, 31 F.4th 119, 128 (2d Cir. 2022). Having proceeded through each of these steps, the Court is not persuaded that Turkey is the appropriate forum in this case.

At step one, the Court must "begin with the assumption that the plaintiff's chosen forum will stand." Iragorri, 274 F.3d at 71. The plaintiff's choice of forum is entitled to even greater deference when the plaintiff has chosen to sue in the plaintiff's home forum because that forum is "presumed to be convenient." Id. However, if it appears that the plaintiff's choice of forum was "motivated by forum-shopping reasons," rather than convenience,

then the Court must accord that choice less deference. Id. at 72. Here, Sinclair chose to file suit in its home forum, New York. See Brown v. Lockheed Martin Corp., 814 F.3d 619, 627 (2d Cir. 2016) (explaining that corporate defendants are considered "at home" both where they are incorporated and where they maintain their principal place of business). Nothing in the record suggests that Sinclair engaged in forum shopping by proceeding in its home forum. Sinclair's choice of forum is therefore entitled to significant deference.

Proceeding to step two, the Court must determine whether defendants' proposed forum, Turkey, is adequate. To that end, the Court must consider whether the defendants are amenable to service of process in Turkey, whether Turkey permits litigation of the subject matter of the parties' dispute, and whether Turkey provides adequate due process. See Aenergy, S.A., 31 F.4th at 130. Sinclair does not dispute that defendants are amenable to service of process in Turkey or that Turkey permits litigation of its tortious interference claims.[6] Instead, Sinclair argues that "[m]ultiple news organizations have covered corruption within the Turkish judiciary, including evidence of corruption, arbitrary arrest and

---

[6] Sinclair argues that Turkey does not permit litigation of its false imprisonment claim. See Answering Brief at 14-15. However, as discussed above, this Court cannot exercise personal jurisdiction over defendants with respect to that claim. Accordingly, the Court need not consider that argument as part of its forum non conveniens analysis.

detention, and denials of fair trials." Answering Brief at 15
(gathering sources).

Even so, "American courts should be wary of branding other
nations' judicial forums as deficient in substance or procedure,
as such denunciations . . . run counter to principles of
international comity." Palacios v. The Coca-Cola Co., 757 F. Supp.
2d 347, 358-59 (S.D.N.Y. 2010); see also Blanco v. Banco Indus. de
Venezuela, 997 F.2d 974, 982 (2d Cir. 1993) ("[I]t is not the
business of our courts to assume the responsibility for supervising
the integrity of the judicial system of another sovereign
nation."). Moreover, in recent years, multiple district courts
have determined, and the Second Circuit has affirmed, that Turkey
is an adequate forum. See, e.g., Owens v. Turkiye Halk Bankasi
A.S., No. 21-610, 2023 WL 3184617, at *3-4 (2d Cir. 2023). The
Court has some reservations concluding that Turkey is an adequate
forum in this particular case, where Sinclair has alleged that the
defendants had its CEO arrested by Turkish authorities. However,
given that Sinclair does not contest that the defendants are
amenable to service of process in Turkey or that its tortious
interference claims could be litigated there, the Court
nevertheless concludes that Turkey is an adequate forum for
purposes of step two of the forum non conveniens analysis.

Finally, the Court must balance the private and public
interests implicated by Sinclair's choice of forum. "With respect

to private interest factors, [courts] assess the relative ease of access of sources of proof; the availability of compulsory process for attendance of the unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make a case easy, expeditious, and inexpensive." Aenergy, S.A., 31 F.4th at 132-33. "With respect to the public interest factors, [courts] consider administrative difficulties associated with court congestion; the unfairness of imposing jury duty on a community with no relation to the litigation; the interest in having localized controversies decided at home; and avoiding difficult problems in conflict of laws and the application of foreign law." Id.

In this case, the private and public interest factors favor proceeding in this forum. As discussed above, Sinclair, an American company with its headquarters and principal place of business in New York, allegedly suffered harm when the Ministry failed to make payments to its New York bank account, when Bank of America closed that account, and when the defendants caused defamatory emails to be sent to New York recipients. Moreover, all of Sinclair's employees and defendant Henin speak English. And the relevant documents, including the various supply agreements and allegedly defamatory emails, are in English. By contrast, apart from Solomon's imprisonment, none of the relevant conduct is alleged to have occurred in Turkey. And none of plaintiff's employees are

located in Turkey or speak Turkish. The private and public interest factors thus favor adjudicating the case in New York, rather than Turkey.

Under these circumstances, where Sinclair's choice of forum is entitled to significant deference and the private and public interest factors weigh in Sinclair's favor, "the balance" is not "strongly in favor of the defendant," so "the plaintiff's choice of forum should [not] be disturbed." Iragorri, 274 F.3d at 70. Accordingly, the Court declines to dismiss the amended complaint on forum non conveniens grounds.

C. Failure to State a Claim

Having determined that the Court can exercise personal jurisdiction over defendants with respect to Counts 1 and 2 and having rejected Barer's forum non conveniens argument, the Court proceeds to consider whether Sinclair has stated claims for tortious interference with contract and current and prospective business relationships. As discussed below, the Court concludes that the complaint contains sufficient factual allegations as to both claims.

i. Tortious Interference with a Contract (Count 1)

Under New York law, a plaintiff raising a tortious interference claim must adequately allege that a valid contract existed, that a third party knew about the contract, that the third party intentionally and improperly procured a breach of the

contract, and that the plaintiff suffered harm as a result. See Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006); see also Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996) (outlining the four elements).

In this case, the amended complaint contains sufficient factual allegations as to each element. Sinclair alleges that it secured five supply agreements with the Ministry, pursuant to which Sinclair would manufacture and ship military uniforms and textiles in exchange for approximately $35 million. Sinclair further alleges that the defendants intentionally and improperly procured a breach of those agreements by conspiring to convince the Ministry to pay a portion of the $35 million to Barer, rather than Sinclair. To that end, Henin assigned Sinclair's right to receive outstanding funds to Barer in a fraudulent assignment agreement. As a result, the Ministry paid Barer, rather than Sinclair, $14.5 million in breach of the supply agreements. At this stage of the proceedings, these allegations are sufficient to survive a motion to dismiss.

Barer nevertheless argues that Sinclair has failed to state a claim for tortious interference with the supply agreements for four reasons, none of which is persuasive. First, Barer argues that the complaint does not contain sufficient factual allegations that Ercan participated in the conspiracy. However, attached to the complaint and integral to it is a communication from Ercan to the Ministry stating that Barer, rather than Sinclair, is the

proper party to the supply agreements pursuant to the assignment agreement. See Exhibit E. Combined with the complaint's general allegations about all three defendants, that communication is sufficient to state a claim as to Ercan.

Second, Barer argues that Henin was a party to the supply agreements, so that he cannot be liable as a third party for tortious interference. However, as the complaint makes clear, the only two parties to those agreements were Barer and the Ministry. Henin merely executed the agreements on Barer's behalf. Although Henin was therefore a signatory to those agreements, he was not a party to them and remains a third-party for purposes of Barer's tortious interference claim. Cf. Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Trust, 688 F. Supp. 2d 229, 242-43 (W.D.N.Y. 2010) ("This Court, in finding that the complaint sufficiently pleaded a cause of action for tortious interference, stated, 'When, if as here, the officer commits fraudulent, deceitful acts motivated by a personal desire for monetary gain at the expense of the plaintiff, we see no reason to shroud him with a mantle of immunity upon the fictitious theory that he was protecting the interests of the corporation, its stockholders and creditors in the performance of his duties as a corporate officer.'" (quoting Buckley v. 112 Central Park S., Inc., 285 A.D. 331, 335 (1st Dep't App. Div. 1954)).

Third, Barer suggests that Sinclair has failed to adequately allege that defendants intentionally procured a breach of the supply agreements or that the agreements were breached because both issues are currently the subject of arbitration between the parties in Ukraine. However, the subject or status of related arbitration proceedings has no bearing on whether the amended complaint in this case contains sufficient factual allegations to survive a motion to dismiss. For the reasons outlined above, the amended complaint contains sufficient factual allegations that all three defendants conspired to direct funds from the Ministry through a forged assignment agreement.

Finally, Barer argues that dismissal is warranted because Barer failed to attach the assignment agreement to its complaint, as required for fraud claims under Federal Rule of Civil Procedure 9(b). Assuming that Rule 9(b) applies to Barer's tortious interference claim, it does not require that a plaintiff attach exhibits to its complaint. Instead, it merely requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In this case, the amended complaint makes clear that Barer could not attach the assignment agreement because the defendants have concealed it. In lieu of the agreement itself, Barer attaches a communication sent by Ercan to the Ministry that specifically refers to the agreement and discusses its substance. See Exhibit E. The amended complaint then

explains how the assignment agreement served to assign the Ministry's outstanding balance to Sinclair. Under these circumstances, Barer's allegations regarding the assignment agreement amply satisfy Rule 9(b).

Having thus rejected each of Sinclair's arguments, the Court denies the defendants' motion to dismiss Count 1.

      ii. Tortious Interference with a Current and Prospective Business Relationships (Count 2)

To raise an adequate claim for tortious interference with a current or prospective business relationship under New York law, a plaintiff must allege that it had a business relationship with a third party, that the defendant knew about that relationship, that the defendant interfered with that relationship through dishonest or improper means, that the defendant acted with malice, and that the business relationship was injured as a result. See Goldhirsh Grp. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997).

As with its allegations as to Count 1, the amended complaint contains sufficient allegations as to Count 2. Sinclair alleges that the defendants interfered with its business relationship with the Ministry by both creating the fraudulent assignment agreement and making false statements to Ministry officials. As a direct result of that conduct, the Ministry not only breached the supply agreements, but also terminated its business relationship with Sinclair. Sinclair then suffered actual economic harm both from

the Ministry's failure to pay outstanding fees and prospective economic harm from the loss of the business relationship. Moreover, conspiring with the other defendants, Henin falsely told officials at Bank of America that Sinclair and Solomon were engaged in criminal conduct, leading to the closure of Sinclair's Bank of America account in New York.

Defendants argue that these allegations are insufficient because Sinclair did not allege that the defendants had knowledge of Sinclair's business relationship with Bank of America. However, the amended complaint alleges that Henin contacted officials at Bank of America about Sinclair. Sinclair thus implicitly alleges that Henin was aware of Sinclair's business relationship with Bank of America. After all, if Henin had not been aware of that relationship, then there would have been no reason for him to contact Bank of America about Sinclair. In addition, defendants do not dispute that they had knowledge of Sinclair's business relationship with the Ministry. Accordingly, Sinclair's allegations are sufficient to satisfy the knowledge requirement at the motion to dismiss stage.

Defendants also argue that Sinclair has not alleged that Henin's conduct was the sole reason why Bank of America closed its New York account. However, the defendants have not identified any authority requiring that their alleged conduct serve as the sole cause of the injury to the plaintiff's business relationship.

Moreover, even if such a requirement existed, on a motion to dismiss, this Court must construe the allegations in the amended complaint in the light most favorable to Sinclair. See <u>York v. Ass'n of Bar of City of N.Y.</u>, 286 F.3d 122, 125 (2d Cir. 2002). Sinclair alleges that Bank of America closed its New York account because of the defendants' conduct and does not point to any other possible basis for the closure. Under these circumstances, Sinclair has adequately alleged that the defendants injured its business relationship with Bank of America. And, again, the defendants do not raise a similar argument with respect to Sinclair's relationship with the Ministry, which serves as an additional and independent basis for its claims under Count 2.

Accordingly, the Court similarly denies the defendants' motion to dismiss Count 2.

IV.  Conclusion

For the foregoing reasons, the Court reconfirms its prior Order denying the defendants' motion to dismiss with respect to Counts 1 and 2, but granting the motion with respect to Counts 3, 4, and 5.

New York, NY
7/28, 2025

JED S. RAKOFF, U.S.D.J.