UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ SINCLAIR & WILDE, LTD.,              │
│                                      │
│           Plaintiff,                 │
│                                      │
│     -against-                        │
│                                      │
│ BARER HOLDING CO. ET AL.,            │
│                                      │
│           Defendants.                │
├─────────────────────────────────────┤
│ BARER HOLDING CO.,                   │
│                                      │
│      Third-Party Plaintiff,          │
│                                      │
│     -against-                        │
│                                      │
│ PHILIPPE HAIM SOLOMON,               │
│                                      │
│      Third-Party Defendant.          │
└─────────────────────────────────────┘
```

24-cv-8488 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

This case arises from a dispute between plaintiff Sinclair & Wilde, Ltd. ("Sinclair") and defendants Barer Holding Company ("Barer"), Carl Erik Henin, and Oktay Ercan (collectively, "defendants"). The dispute centers around a contract between Sinclair and Barer to supply the Ministry of Defense of Ukraine (the "Ministry") with military uniforms and textiles. The Court previously granted in part and denied in part defendants' motion to dismiss. See ECF No. 23. Since then, Barer has filed counterclaims and third-party claims against Sinclair and Sinclair's CEO, Philippe Haim Solomon. See ECF No. 24.

1

Defendants have now moved for summary judgment dismissing Sinclair's remaining claims and granting Barer's claims against Solomon. See ECF No. 35. For the foregoing reasons, the Court grants in part and denies in part the defendants' motion for summary judgment.

I.  Background

Unless otherwise indicated, the following facts are not materially disputed. Sinclair is owned and operated by Philippe Haim Solomon. In September 2022, Sinclair granted Carl Erik Henin a Power of Attorney ("POA"), authorizing him to act on the company's behalf. The following month, Henin -- acting under that POA -- entered into five contracts (SW-1 through SW-5) with the Ministry for the manufacture and supply of military uniforms. Although the agreements differed in their payment and delivery terms, together they carried a total value of $34,930,400.

In June 2022, before the Ministry contracts were signed, Solomon approached Barer about supplying military uniforms and textiles to the Ministry. Barer agreed to provide the goods to Sinclair for $25,544,000, with 50% of the purchase price due upfront.

In short, by October 2022, Sinclair had contracted with the Ministry to deliver uniforms, and separately, with Barer to produce them. With the Ministry contracts worth nearly $35 million and the

Barer contract priced at about $25 million, Sinclair stood to clear roughly $10 million in profit.

Between October 2022 and early November 2022, the Ministry paid Sinclair $20,410,200, leaving balances outstanding under the SW-1 and SW-5 agreements. Sinclair, in turn, remitted $9,522,000 to Barer (i.e., less than the 50% due upfront under the parties' contract). Barer nevertheless began manufacturing the goods without having received the full prepayment.

By December 2022, Barer had manufactured most of the uniforms but refused to release them without security for the unpaid balance. To resolve the impasse, Henin met with Barer and, acting under his POA, executed a series of agreements assigning Sinclair's right to receive the Ministry's remaining payments directly to Barer (the "Assignment Agreements"). These agreements served as security for Barer, but neither Sinclair nor the Ministry learned of them until several months later.

In the interim, from February to March 2023, Sinclair's relationship with the Ministry deteriorated. Delivery delays and other administrative issues mounted, and the Ministry refused to make further payments despite accepting shipments. Sinclair sent multiple letters demanding payment, but the Ministry did not respond. Instead, it initiated arbitration against Sinclair, which resulted in a fine of more than $5 million against Sinclair.

By March 2023, Barer had delivered the remaining goods to Sinclair. In April 2023, Sinclair completed its final delivery to the Ministry. But Sinclair did not make any additional payments to Barer. Nor did the Ministry make any further payments to Sinclair.

In May 2023, Barer wrote to the Ministry seeking information about the supply contracts. The following month, in June 2023, Barer sent another letter to the Ministry, this time invoking the Assignment Agreements and requesting that payments be made directly to Barer. These efforts proved unsuccessful, and Solomon learned of the Assignment Agreements shortly thereafter.

Sinclair then commenced the instant suit against Barer, Barer's principal Ercan, and Henin. Barer in turn brought counterclaims and third-party claims against Sinclair and Solomon. As noted, the Court subsequently denied some of Sinclair's claims. Before the Court now is the defendants' motion for summary judgment seeking to resolve all of Sinclair's remaining claims, as well as Barer's own claims.

## II. Legal Standard

The familiar standard for summary judgment is that it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law, and is genuinely in dispute if the evidence is such that a

4

reasonable jury could return a verdict for the nonmoving party."[1] Rodriguez v. City of New York, 291 F. Supp. 3d 396, 407 (S.D.N.Y. 2018). A court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." Id. In evaluating a motion for summary judgment, a district court's ultimate question is whether "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." Id. at 408.

III. Discussion

A. Sinclair's Remaining Claims

i.   Tortious Interference with Contract

Defendants move for summary judgment on Sinclair's claim for tortious interference with contract. To prevail on such a claim, a plaintiff must show: (1) the existence of a valid contract, (2) the defendant's knowledge of that contract, (3) the defendant's intentional and improper procurement of a breach, (4) breach of the contract, and (5) resulting damages. See Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006).

Defendants argue that Sinclair's tortious interference claim fails because the alleged interference occurred only after the Ministry had already stopped performing. In their view, there can

---

[1] Unless otherwise indicated, all case quotations omit internal alterations, brackets, citations, ellipses, emphasis, quotations, and quotation marks.

be no procurement of a breach that has already taken place. By January 2023, Sinclair had delivered about 96% of the goods under the supply contracts, but the Ministry had occasioned multiple delivery delays and had not paid under SW-1 and SW-5. See ECF No. 38 ("Defendants' Brief") at 10-11. By February 2023, the Ministry had stopped unloading trucks, refused further acceptance, and withheld payments. Id. Although the Assignment Agreements were executed in December 2022, the Ministry was unaware of them, and defendants did not actively seek payment until May 2023, after the Ministry's breach had occurred. See ECF No. 42 ¶ 108.

Sinclair responds that a jury could nonetheless find defendants' procurement of the breach. It argues that the amounts under SW-1 and SW-5 were not due until final delivery in April 2023, and that defendants concede they approached the Ministry by May 2023 seeking direct payment, and again met with the Ministry in June and July 2023 to press for payment under the Assignment Agreements. See ECF No. 41 ("Plaintiff's Brief") at 10.

There is no dispute as to the first two elements of tortious interference. As to procurement, however, even construing the record in Sinclair's favor, a reasonable jury could not find that defendants' actions caused the breach. Payment was due upon completion of delivery, which occurred no later than April 2023. By then, the Ministry had already withheld payment. Defendants' efforts to secure payment began in May 2023, after the breach.

6

At oral argument, Sinclair raised for the first time the suggestion that the Ministry's payment obligation arose only after Sinclair submitted certain post-delivery documents, such as an invoice, and that defendants' procurement in May could have overlapped with that period. But arguments first raised at oral argument are not evidence, see McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani, 295 F. Supp. 3d 404, 414 n.5 (S.D.N.Y. 2017), and in any event the record reflects that by April 2023 the Ministry was already resisting payment and creating disputes over delivery. See ECF No. 42 ¶¶ 95-97, 100.

Accordingly, because no reasonable jury could conclude that defendants' conduct procured the breach, summary judgment is granted, dismissing plaintiff's claim of fraudulent interference with contract.

### ii. Tortious Interference with a Prospective Economic or Business Relationship

Similarly, the Court grants the defendants' motion for summary judgment on Sinclair's claim for tortious interference with a prospective economic or business relationship. To prevail on such a claim, a plaintiff must establish: (1) the existence of a business relationship with a third party, (2) the defendant's knowledge of that relationship and intentional interference with it, (3) that the defendant acted out of malice or by using dishonest, unfair, or improper means, and (4) that the interference caused injury to the relationship. See Carvel Corp. v. Noonan, 350

7

F.3d 6, 17 (2d Cir. 2003). Here, no reasonable jury could find that Sinclair had a prospective business opportunity with the Ministry by the time defendants acted.

Even viewing the facts in Sinclair's favor, the record shows that by May 2023, Sinclair had no ongoing or prospective economic relationship with the Ministry. By that point, the Ministry had already refused payment, Sinclair had alleged bad faith and uncooperative behavior on the part of the Ministry, and Solomon, according to his own testimony, intended by then to pursue legal action against Ukraine. See ECF No. 42 ¶¶ 95-97, 100, 122.

Sinclair points to testimony suggesting discussions with the Ministry for future uniform and military drone orders. But the company cites no record evidence that these discussions occurred after the undisputed deterioration of the relationship and thus cannot show that the defendants' actions were the "but-for" cause of any damages. See Ortiz v. Todres & Co., LLP, 2019 WL 1207856, at *6 (S.D.N.Y. Mar. 14, 2019) (unpublished).

Accordingly, summary judgment is warranted dismissing this claim because no reasonable jury could conclude that the defendants' conduct caused harm to a relationship already in the midst of collapse.

 iii. Breach of Fiduciary Duty

Sinclair also asserts a breach of fiduciary duty claim against Henin. To prevail, a plaintiff must demonstrate: (1) the existence

of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages resulting from that conduct. See Yukos Cap. S.A.R.L. v. Feldman, 977 F.3d 216, 241 (2d Cir. 2020). Summary judgment is denied as to this claim because a reasonable jury could conclude that Henin breached his fiduciary duty when he executed the Assignment Agreements.

Defendants advance four arguments in support of dismissal. First, they contend that Henin's conduct does not constitute misconduct. They argue that because Sinclair failed to pay Barer the 50% upfront amount, Barer was under no obligation to perform, and any nonperformance would have caused Sinclair to breach its Ministry contracts. According to defendants, Henin signed the Assignment Agreements to protect Sinclair's interests. See Defendants' Brief at 15.

But a jury could reasonably view the facts differently. While Henin's actions may have been intended to protect Sinclair, the record also permits the inference that he was motivated by personal interest. Henin expressed concern about potential personal liability in connection with the original supply agreements. See ECF No. 37, Exh. J ("Henin Deposition"), at 32:8-21. He was also offered a $1 million commission contingent on signing the agreements. See ECF No. 42 ¶ 79. These facts provide sufficient basis for a jury to conclude that Henin acted out of self-interest.

Second, defendants argue that Sinclair suffered no damages because it realized all anticipated profits from the contracts. Defendants' Brief at 16. Sinclair counters that the Assignment Agreements exposed the company to late fees, quality-related disputes, and arbitration proceedings with the Ministry. A jury could reasonably find that, even if Sinclair received all intended profits, Henin's actions increased the company's exposure to risk and liability.

Third, defendants contend that the Assignment Agreements did not cause the Ministry's breach. This argument misstates the standard for a fiduciary duty claim. Sinclair need only show that Henin acted outside his fiduciary authority and that those actions resulted in damages. Here, Sinclair alleges that Henin's execution of the Assignment Agreements exposed the company to liability through arbitration, which constitutes damages causally linked to his conduct.

Finally, defendants assert that the Power of Attorney under which Henin acted insulates him from liability. They note that the agreement indemnifies Henin for acts made "in good faith in the Attorney's role as Attorney of the company pursuant to the powers set forth in this Power of Attorney." See ECF No. 42 ¶ 27. Sinclair maintains that Henin did not act in good faith or within the scope of his authority. Because a jury could credit this evidence, this defense does not warrant dismissal.

Accordingly, summary judgment is denied on plaintiff's breach of fiduciary duty claim against Henin. A reasonable jury could find that Henin (1) owed a fiduciary duty to Sinclair, (2) acted wrongfully, and (3) exposed Sinclair to potential liability through his execution of the Assignment Agreements.

### iv. Aiding and Abetting Breach of Fiduciary Duty

For similar reasons, summary judgment is also inappropriate on Sinclair's aiding and abetting breach of fiduciary duty claim against Barer and Ercan. To prevail, a plaintiff must show: (1) a breach of fiduciary duty by a fiduciary, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result. See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 652 F. Supp. 2d 495, 502 (S.D.N.Y. 2009). The only distinction from the direct breach claim is that Sinclair must show Barer and Ercan knowingly induced or participated in Henin's breach.

A reasonable jury could find that Barer and Ercan knowingly induced or participated in the breach. It is undisputed that both were aware of Henin's fiduciary duties to Sinclair, and the record shows they financially incentivized Henin to execute the Assignment Agreements.

Defendants contend that Henin did not breach his fiduciary duty and that, even if he did, Sinclair suffered no damages caused by Barer or Ercan. For the reasons already discussed, however, a

11

reasonable jury could find that Henin breached his fiduciary duty and that the Assignment Agreements exposed Sinclair to liability and litigation. Accordingly, summary judgment is inappropriate on this claim.

> B. Barer's Claims

> i.    Breach of Contract

Barer asserts a counterclaim against Sinclair for breach of the Sinclair/Barer contract. To prevail, Barer must establish: (1) the existence of a contract, (2) performance by Barer, (3) a breach by Sinclair, and (4) resulting damages. See Genger v. Genger, 76 F. Supp. 3d 488, 496 (S.D.N.Y. 2015).

Sinclair concedes the existence of a contract, partial performance by Barer, and that Barer is owed some amount under the contract. See Plaintiff's Brief at 12. Sinclair contests only the extent of Barer's performance and the amount of damages owed. Id.

No triable issue exists as to this claim. There is no dispute that Barer fully delivered its products by March or April 2023. The question of "performance" as Sinclair raises it goes to the quality of the products and delays in delivery. But Solomon testified to SW-1's full fulfillment. ECF No. 37, Exh. C ("Solomon Deposition"), at 194:18-197:7.[2] And when Solomon was asked to

---

[2] The deposition transcript was filed, and remains, under seal. But as per the parties' protective order, the Court "retains unfettered discretion whether or not to afford confidential treatment to any Confidential Document or information contained in

explain the reason for late deliveries as to the other contracts, he laid the blame squarely on the Ministry, rather than on Barer. Id.

Regarding defects, New York law treats trivial defects as insufficient to preclude summary judgment. See Zilgme v. United States, 2017 WL 9516810, at *6 (W.D.N.Y. 2017) (unpublished). The full circumstances need to be considered to determine whether a defect was trivial or not. Id. Here, however, no jury could reasonably conclude that the defects were anything but trivial. Sinclair never raised with Barer any issue Barer's performance nor raised any claim of previous defects as a justification not to pay Barer. Furthermore, the number of defects was minimal. Solomon never testified to any defects in SW-1, but in SW-2 for instance, around 7,489 uniforms of 200,000 were not accepted by the Ministry due to alleged defects. See Solomon Deposition at 195:11-196:16. In SW-3, similarly, there were about 5,000 uniforms out of 200,000 not accepted. Id. And in SW-5, of the 500,000 uniforms delivered, none were testified to have been rejected due to defects. Id. Thus, considering the surrounding circumstances, these defects were "trivial" because they were minimal, not raised earlier, and did not play a large role in any of the breaches at issue in this case.

---

any Confidential Document submitted to the Court in connection with any motion, application, or proceeding that my result in an order and/or decision by the Court." ECF No. 28 at 5.

In any case, the contract between Sinclair and Barer had a provision to deal with defects. Sinclair's payments were split for SW-1, with half due upfront, and half due after inspection but before delivery. See ECF No. 42 ¶ 46. For SW-5, the terms were similar: Sinclair owed half upfront, and half on the date of delivery. Id. ¶ 49. If Sinclair intended not to pay Barer because of quality defects, there were opportunities to do so. At this juncture, however, Sinclair cannot justify its breach by arguing that Barer only partially performed because no reasonable jury could conclude the breach was justified.

Thus, the Court grants summary judgment in favor of Barer on Barer's breach of contract claim against Sinclair.

ii.    Fraudulent Inducement and Fraudulent Concealment

Barer also asserts claims of fraudulent inducement against Sinclair and fraudulent concealment against Solomon.

A claim for fraudulent inducement requires a plaintiff to show: (1) a material representation of fact, (2) that was false, (3) known to be false or made with reckless disregard for the truth, (4) offered to induce another to act, and (5) reliance causing injury. See Bentivoglio v. Event Cardio Grp., Inc., 2021 WL 736811, at *7 (S.D.N.Y. Feb. 24, 2021) (unpublished). Fraudulent inducement claims can also be based upon the omission of information, so long as that omission is "material" and the information needed be communicated to the other party and otherwise

14

meets the elements of this claim. See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007); Barron Partners, LP v. LAB123, Inc., 593 F. Supp. 2d 667, 672 (S.D.N.Y. 2009).

A fraudulent concealment claim requires proof of: (1) a duty to disclose material facts, (2) knowledge of those facts, (3) failure to discharge a duty to disclose, (4) scienter, (5) reliance, and (6) damages. See Basso v. New York Univ., 2020 WL 7027589, at *14 (S.D.N.Y. Nov. 30, 2020) (unpublished).

Defendants argue that Sinclair and Solomon concealed the contract price they secured from the Ministry (approximately $35 million) to induce Barer to perform under the Sinclair/Barer contract (approximately $25 million). Barer contends it expected to contract directly with the Ministry and did not learn of the markup until February or March 2023. Sinclair responds that defendants' argument depends on unresolved facts: whether Barer, rather than Sinclair, was supposed to execute the Ministry contracts, and the precise value of those contracts.

Summary judgment is inappropriate because genuine issues of material fact remain. First, as to the fraudulent concealment claim, it is not self-evident that Solomon had a duty to disclose the contract price to Barer. Barer contends that such a duty arose from a fiduciary relationship, but the existence of that relationship is disputed. Sinclair notes that the only evidence

15

suggesting such a duty is a letter to an individual in Ukraine
stating that Sinclair "represent[s] Barer Holdings for the purpose
of supplying Military Uniforms to the Republic of Ukraine." See
ECF No. 36, Exh. G. That letter, Sinclair contends, does not
clearly lay out a fiduciary relationship and only mentions
Sinclair, not Solomon. Barer disagrees, but these are questions
that a jury could reasonably disagree on, and so summary judgment
is inappropriate at this time.

Moreover, even aside from the issue of whether the information
needed be provided, other issues remain. For fraudulent
inducement, a jury could conclude Barer knew that it was
contracting with Sinclair, rather than the Ministry. And for both
the fraudulent inducement and concealment claims, a jury could
reasonably conclude that Sinclair and Solomon did not intend to
deceive Barer or that there was no scienter. Even Barer admits in
its reply brief that there is only at least a "strong inference of
fraudulent intent," ECF No. 43 ("Reply Brief"), at 7, which is
insufficient to dispose of the claims at summary judgment.

Accordingly, the factual disputes underlying these claims
must be resolved by a jury. Summary judgment is therefore denied.

    iii.  Unjust Enrichment

Barer's motion for summary judgment on its claim for unjust enrichment against Solomon is granted.[3] To succeed on an unjust enrichment claim, the plaintiff must show: (1) the other party was enriched, (2) at the plaintiff's expense, and (3) it is against equity and good conscience to permit the other party to retain what is sought to be recovered. See Caro Cap., LLC Caro Partners, LLC v. Koch, 2022 WL 463338, at *14 (S.D.N.Y. Feb. 14, 2022) (unpublished). The last element is the "essential inquiry," Rhee v. SHVMS, LLC, 2023 WL 3319532, at *12 (S.D.N.Y. May 8, 2023) (unpublished), and courts assess it by considering whether the benefit was conferred by mistake, or whether the defendant's conduct was tortious or fraudulent. Id.

Here, there is no dispute that Solomon received money or a benefit at Barer's expense. The Ministry paid Sinclair $20,410,200. See ECF No. 42 ¶ 50. Sinclair admits that it failed to pay the upfront amount due to Barer and that it still owes Barer money. Id. at ¶¶ 51-53. And Sinclair further admits that at least $10,500,000 in Ministry proceeds were deposited into Solomon's personal account and used for Solomon's personal business operations. Id. at ¶ 130. Accordingly, Solomon was unjustly

---

[3] The original claim for unjust enrichment was brought against both Sinclair and Solomon. See ECF No. 24 at 22. At summary judgment, however, Barer only moved against Solomon on this claim. See Defendants' Brief at 9 ("Barer is entitled to summary judgment on its unjust enrichment claim against Mr. Solomon.").

enriched because he intentionally received money, at least a portion of which was owed to Barer, and personally benefited from it.

The arguments by Sinclair (including Solomon) to the contrary are unavailing. The company contends that the $10,500,000 was paid to Sinclair, not Solomon. But as explained above, the record establishes that the funds were eventually deposited into Solomon's personal account. Sinclair also alleges that a factfinder could conclude Barer is not entitled to the full $10.5 million because Barer allegedly breached the contract and caused issues for Sinclair. But liability for the entire sum is not required to sustain the claim; at minimum, the amount owed upfront under the Barer/Sinclair contract was due to Barer. Finally, Sinclair argues that the contracts between Sinclair and Barer foreclose an unjust enrichment claim against the CEO of Sinclair for a transaction within the scope of the agreements. But that conclusion rests on the requirement that the transactions be a part of the same subject-matter. Here, the "unjust enrichment claim is distinct from [Barer's] contract claim," Rider v. Uphold HQ Inc., 657 F. Supp. 3d 491, 502 (S.D.N.Y. 2023), because the unjust enrichment claim focuses on proceeds that Solomon received, while the contract governed the relationship between Barer and Sinclair.

Accordingly, summary judgment is granted on Barer's unjust enrichment claim.

iv.   Breach of Fiduciary Duty

Barer's breach of fiduciary duty claim against Solomon is not suitable for summary judgment. To prevail on such a claim, a plaintiff must establish: (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by that misconduct. See Rhee, 2023 WL 3319532, at *14.

A genuine dispute exists regarding whether Solomon owed Barer a fiduciary duty. As discussed supra, the only evidence suggesting such a duty is a letter sent by Sinclair -- not Solomon -- to an individual in Ukraine stating that the company "represent[s] Barer Holdings for the purpose of supplying Military Uniforms to the Republic of Ukraine." See ECF No. 36, Exh. G.

In assessing fiduciary duties, courts look to the substance of the relationships, rather than the labels used. Morgan Art Found. Ltd. v. Brannan, 2020 WL 469982, at *19 (S.D.N.Y. Jan. 28, 2020) (unpublished). Whether a fiduciary relationship exists is "essentially a factual determination." BNP Paribas Mortg. Corp. v. Bank of America, N.A., 866 F. Supp. 2d 257, 270 (S.D.N.Y 2012).

Several factors could lead a reasonable factfinder to conclude that Solomon did not owe a fiduciary duty to Barer. First, the letter originates from Sinclair, not Solomon individually. Barer contends that Sinclair is an alter ego of Solomon, but even accepting that premise, the letter provides little more than a

label and does not clearly establish the substance of a fiduciary relationship. See Morgan Art Found., 2020 WL 469982, at *19. Moreover, record evidence could support the conclusion that no fiduciary relationship existed. For instance, Solomon testified that, while he had the exclusive right to sell Barer products to the Ministry, he could also sell products from other manufacturers to the Ministry. Solomon Deposition at 168:13-21.

Accordingly, summary judgment is denied as to Barer's breach of fiduciary duty claim against Solomon.

> v.   Declaratory Judgment that the Assignment Agreements
>      were Valid

Finally, Barer seeks a declaratory judgment that the Assignment Agreements executed by Henin on behalf of Sinclair, which assigned Sinclair's right to payments under the Ministry contracts to Barer, were valid. A district court has immense discretion when it comes to declaratory judgments, see Admiral Ins. Co. v. Niagara Transformer Corp., 57 F.4th 85, 97 (2d Cir. 2023), but courts exercise that discretion by considering, inter alia, whether the judgment will serve a useful purpose in clarifying or settling legal issues and whether judgment would finalize the controversy and offer relief from uncertainty, id. at 99-100.

There are at least two reasons to decline to enter a declaratory judgment here. First, there is a reasonable dispute as to the propriety of the Assignment Agreements that would be best

resolved by a jury. The Power of Attorney issued to Henin authorized him to: (1) execute "any and all documents and formalities ancillary to the supply agreements which [Mr. Henin] in [his] absolute discretion considers to be necessary for execution of the Agreement," and (2) "do or undertake any other action which [Mr. Henin] may in his absolute discretion deem necessary or conducive to the exercise of powers contained within this general [POA]." See Defendants' Brief at 24.

Sinclair contends that the POA did not authorize Henin to assign Sinclair's rights to payment from the Ministry. Rather, Sinclair argues, the POA permitted Henin to enter into purchase agreements with the Ministry and to take actions in furtherance of those agreements. Sinclair further argues that a jury could find the Assignment Agreements were unauthorized and constituted a breach of fiduciary duty, aided and abetted by Barer and Ercan, and that their existence was concealed from Sinclair. See Plaintiff's Brief at 19-20.

The POA does grant Henin broad authority to sign and execute agreements on Sinclair's behalf with the Government of Ukraine, including additional documents and actions he deemed necessary to exercise the powers contained therein. It is possible that Henin believed the Assignment Agreements were within the scope of his authority and that he was acting to ensure Sinclair's contracts with the Ministry were fulfilled.

On the other hand, a jury could reasonably conclude that Henin acted in his own interest rather than Sinclair's. The record contains evidence that Henin was potentially financially incentivized and concerned about personal liability. See, e.g., Henin Deposition 32:10-15. Given this evidence, a jury could reasonably find that Henin was not acting in the company's best interest when executing the Assignment Agreements. Therefore, a declaratory judgment would be premature.

The second reason this Court declines to enter a declaratory judgment is that, while a declaratory judgment would assist in resolving other claims, such relief would not finalize this controversy. See Admiral Ins., 57 F.4th at 99-100. Even if the Assignment Agreements were held to be valid, for instance, this case would continue with Barer's claims against Sinclair and Solomon.

Accordingly, Barer's request for a declaratory judgment as to the validity of the Assignment Agreements is denied.

IV.  Conclusion

For the foregoing reasons, the Court partially grants and partially denies the defendants' motion for summary judgment. Specifically, the Court grants the defendants' motion as to Sinclair's claims for tortious interference with contract and with prospective economic or business relations and as to Barer's claims against Sinclair and Solomon for breach of contract and unjust

enrichment. The Court denies the defendants' motion as to plaintiff's claims for breach of fiduciary duty and aiding and abetting such a breach, as well as Barer's claims for fraudulent inducement, breach of fiduciary duty, fraudulent concealment by a fiduciary, and for a declaratory judgment upholding the validity of the Assignment Agreements. Counsel for the parties are directed to jointly call the Court by no later than September 26 to set a date for trial of the remaining claims. The Clerk is respectfully directed to close ECF Numbers 35, 41, and 43.

 SO ORDERED.

New York, NY

September  22 , 2025      JED S. RAKOFF, U.S.D.J.